FILED
May 21, 2025
08:54 AM(CT)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | |
|---|---|
| Lindsey Hoffman, | ) Docket No. 2024-60-0181 |
| Employee, | ) |
| v. | ) |
| HCA Health Services of Tennessee | ) |
| d/b/a Tristar Summit Medical | ) State File No. 960009-2024 |
| Center, | ) |
| Employer, | ) |
| And | ) |
| Indemnity Insurance Co. of America, | ) Judge Kenneth M. Switzer |
| Carrier. | ) |

---

## EXPEDITED HEARING ORDER DENYING BENEFITS

---

This case presents a complicated issue: whether Lindsey Hoffman timely notified HCA Health Services of Tennessee of her PTSD and major depression that she alleged arose primarily out of her employment. After an expedited hearing on April 30, 2025, and giving the evidence thorough consideration, the Court ~~finds that she did not give timely notice and holds she is not likely to prevail at a hearing on the merits that she~~ is entitled to benefits.

## Claim History

*Employee's direct testimony*

Ms. Hoffman worked for HCA as an emergency medicine clinical pharmacist at Tristar Summit hospital. The job required her to respond to emergencies such as strokes or intubations; she "dosed and managed everything in the moment in life-or-death situations."

She worked at Summit for over ten years. During that time, Ms. Hoffman believed she filed no workers' compensation claims but acknowledged she was hit in the chest with a CPR stool in March 2023. She reported the injury in the hospital's electronic system

1

described below as an "Employee Health" event.  The injury did not result in her taking any leave.  Rather, "it was evaluated and cleared."'

Ms. Hoffman testified that several events in the emergency department led to her mental injuries.

First, Ms. Hoffman was sitting at her desk in a cubicle on April 9, 2023, with her back toward the behavioral health hallway, when suddenly one of the most dangerous patients approached her.  He was under the influence of methamphetamine and came from behind her, yelling, "Where is she?"  The patient was unsupervised, despite hospital rules that he be under one-to-one supervision by a sitter, and he was on "care alert," the highest security level for patients.  Ms. Hoffman said she felt "helpless" and "traumatized."

Ms. Hoffman testified that she reported the incident to the nursing supervisor and her manager, Alex Stephens, that evening.  She offered no details of those conversations.

She also reported the incident on April 10 in writing using Summit's electronic "Vigilanz" system.  The parties stipulated that this system allows hospital staff to report events occurring on the premises.  Reportable events "include, but are not limited to, employee work-injuries, patient safety concerns, behavioral events, environmental events or concerns, near-miss incidents, and security events or concerns."  The parties further agreed that work injuries should be reported under the Vigilanz "Non-Patient/Employee Health" portal, but Ms. Hoffman instead created a "Security Event" in the system for the incident.

The next day, the same patient again escaped his room without supervision.  The event "exacerbated" Ms. Hoffman's fear from the previous evening.  She testified that the events were "uncommon," and they were "extraordinary and unusual" for a pharmacist.

Ms. Hoffman reported the incident through Vigilanz using "Patient Provision of Care."  She also told Mr. Stephens about "the situation with this patient" and that she felt unsafe at work and was "terrified."  Mr. Stephens responded that he would ask about erecting a barrier between her back and the behavioral health ward.

Per her usual schedule, Ms. Hoffman was off for the next seven days, when Mr. Stephens texted her on April 12 to tell her a work order had been entered for the barrier. On April 19, she spoke with him again and texted him a photo of another barrier in the hospital as an example.  But on Ms. Hoffman's return, no barrier was in place, and the dangerous patient had been relocated closer to her desk, in the room directly behind it, rather than moved farther away.

An additional injury-inducing event took place on April 23 and involved a patient arriving at the emergency department with a gun on his person.  Ms. Hoffman and others

were attending to him, giving him CPR. She testified that she was focused on her crash-cart tray and the life-saving medications during the attempts to save the patient's life. The EMS coordinator saw the gun on the patient and secured it while the CPR continued. She later learned that the gun had been "fumbled around" and pointed at her.

Ms. Hoffman reported this incident using Vigilanz the next day as a "close call/near miss." She also discussed it with Mr. Stephens and Martin Bruck, the pharmacy director, during the shift, but she did not give details about these conversations. After this "extraordinary" event, she felt worse and that her "safety wasn't a priority."

After the April 9 incident, Ms. Hoffman found another area to work, which was not her designated desk. The temporary area was outside the emergency department, had a door, and her back was not turned to the behavioral health ward. She did this for several weeks until she was "kicked out."

After the April 2023 events, Ms. Hoffman began experiencing flashbacks, panic attacks, hypervigilance, insomnia, and nightmares. She also started isolating and eating poorly, and she stopped working out. The events affected her ability to perform her job. The position required the ability to think on her feet, but since she was not sleeping or eating well, it became difficult for her to concentrate at work.

Ms. Hoffman said HCA never offered medical treatment, so she treated on her own starting in late June. Rebecca Hill, a nurse practitioner, diagnosed adjustment disorder. She did not introduce these records.

Ms. Hoffman worked during the summer months but also used paid time off. She continued asking both Mr. Stephens and Mr. Bruck about a barrier. Mr. Bruck told her in a work-messaging platform that he "found out about the situation and was escalating it to administration." Ms. Hoffman could not recall when this conversation happened. She also expressed her concerns to the chief medical officer, who promised assistance. Neither Mr. Bruck nor the CMO delivered on their promises.

As for Mr. Stephens, Ms. Hoffman spoke with him frequently and was crying and "visibly distraught" during their conversations. During one discussion, he recommended she use the hospital's employee assistance program, and she told him she was seeing someone. She also told Mr. Stephens that she missed being her old self; he responded that he did, too. Ms. Hoffman did not say when this conversation took place.

During this time, the only action the hospital took was to place bicycle mirrors near her desk and cubicle, which did not allay her fears.

Once Ms. Hoffman realized that no changes would be made, she decided to take medical leave on September 6. She was told to contact the corporate human resources

department, "HCA HR Answers." Ms. Hoffman submitted a form signed in late September by Ms. Hill, who wrote that Ms. Hoffman suffered from "adjustment disorder-burn out, PTSD" and other conditions. The form also stated that she "feels unsafe at work due to recent guns in ER," and that a barrier to return to work was "unsafe/secure work environment-lacking gun control and staff for aggravated ER patients."

Ms. Hoffman eventually saw Dr. Robert Jamieson, who diagnosed PTSD and major depressive disorder in early October. Dr. Jamieson testified by declaration that "Ms. Hoffman's PTSD primarily, meaning more than 50% arose from the traumatic events she experienced and witnessed while working at Tristar Summit Medical Center beginning on or around April 9, 2023." Ms. Hoffman said she did not report his diagnosis or make a workers' compensation claim afterward because she had no access to Vigilanz.

Ms. Hoffman filed her petition on January 9, 2024, listing an injury date of September 6, 2023, the date her medical leave began.

As for her current circumstances, Ms. Hoffman treats with Ms. Hill. While her condition has improved, she still suffers many of the same symptoms and cannot drive past Summit because it "triggers everything that happened to me." Ms. Hoffman returned to work in her field at another hospital about a year ago. She cannot work in an emergency department or in direct patient care anymore. She works in an office with a door that locks. She feels regret and in a tearful moment said, "Emergency medicine was my passion. It's not a job you get right away out of pharmacy school. I worked really hard to get there."

*Cross-examination*

HCA cross-examined Ms. Hoffman vigorously, and she responded in kind, disagreeing with or evading many questions and occasionally expressing an inability to recall. Yet, she did concede a few points.

For example, Ms. Hoffman acknowledged that she had expressed concerns about her safety when the psych patients were moved closer to her desk and behind her back before April 9. She said she was trained in how to de-escalate situations involving psych patients many years ago. She also agreed that she did not see the EMS coordinator actually "fumbling with" the loaded gun but merely "was told" it was pointed at her.

As to her use of Vigilanz, Ms. Hoffman agreed that she used the "Employee Health" tab to report when she was struck in the chest at work before the April 2023 incidents. She knew that "Employee Health" was the way to report a work injury. Ms. Hoffman agreed that she used "Security Event," "Patient Provision of Care," and "Close-call/Near Miss" but not "Employee Health" on April 9, 10, and 23. But a physical injury differs from a mental injury, which occurs over time, she said, and she did not use "Employee Health"

4

because "the extent of my condition and diagnosis was not known, nor could it be made at that time."

Ms. Hoffman further conceded that she discussed other work stressors with her supervisor, such as a bed bug situation. She agreed that she never requested medical care for a work-related injury, nor did she request that a workers' compensation claim be opened while on the job. Moreover, she never doubted whether her PTSD related to work. Ms. Hoffman never reached out to Kristen Dobsen, the HCA staff member who assisted her after the chest injury, to ask about HCA's response to the April events. She also never submitted medical records or bills seeking to have the April events and resulting treatment be considered as a workers' compensation claim.

Ms. Hoffman maintained that HCA never asked about her mental health or if she needed treatment, but instead she was instructed by "HCA HR Answers" to seek medical leave.

*Employer's proof*

Mr. Stephens attended the hearing but did not testify.

Rather, HCA offered his declaration, where Mr. Stephens did not mention the events of April 9, 10, or 23 and instead focused on Ms. Hoffman's other complaints. Mr. Stephens testified that from April through August 2023, he and others spoke with Ms. Hoffman:

> [T]o address her concerns with procedural and safety measures[.] . . . Multiple ideas and possible solutions were discussed, and some were implemented. However, Ms. Hoffman was not satisfied with any of the suggested or attempted solutions. Based on her continued dissatisfaction with the solutions offered and due to frustrations she raised around employee relations in her department, I suggested Ms. Hoffman speak with someone in our Employee Assistance Program[.]

Mr. Stephens added that during this time, Ms. Hoffman worked her regular shifts without attendance problems. Mr. Stephens testified that Ms. Hoffman never advised him that "she suffered a work-related mental injury" or that "she was in need of medical treatment for a work-related mental injury." Mr. Stephens learned that Ms. Hoffman requested FMLA leave on September 6, 2023, and per protocol he was not told why. Ms. Hoffman never returned from this leave.

Mr. Stephens testified he first learned that Ms. Hoffman filed a workers' compensation claim in May 2024, when Ms. Dobson informed him.

5

For her part, Ms. Dobson testified via declaration that she was notified of Ms. Hoffman's alleged injury on May 16, 2024, when she received copies of the pleadings in this case. In response, Ms. Dobson contacted HCA's workers' compensation third-party administrator. Adjuster Stephanie Edgison's declaration states that she denied the claim on July 30, 2024, after Ms. Hoffman's deposition.

Ms. Dobson further testified that Ms. Hoffman reported a work injury in the Vigilanz system in March 2023. She treated on her own in an emergency room and followed up with Ms. Dobson, a registered nurse, for that injury, but Ms. Hoffman did not request or require further care. Ms. Dobson wrote that the Vigilanz system informs her when an injury report is filed. No other reports of work injuries for Ms. Hoffman were made in Vigilanz.

**Findings of Fact and Conclusions of Law**

Ms. Hoffman must prove she is likely to prevail at a hearing on the merits that she gave timely notice and is entitled to the requested benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2024); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015).

Notice is a threshold issue. Tennessee Code Annotated section 50-6-201(a)(1) requires an employee to "immediately upon the occurrence of an injury, or as soon thereafter as is reasonable and practicable, give or cause to be given to the employer who has no actual notice, [notice] of the accident." In addition, "No compensation shall be payable under this chapter, unless the written notice is given to the employer within fifteen (15) days after the occurrence of the accident, unless reasonable excuse for failure to give the notice is made to the satisfaction of the tribunal to which the claim for compensation may be presented." *Id.*

Ms. Hoffman argued that after each sudden and disturbing event at work, she gave timely written notice via the Vigilanz reports in compliance with the statute. In the alternative, she asserted that HCA had actual notice through her many conversations with Mr. Stephens and others in the weeks and months after the incidents. At trial, she further contended that on September 6, 2023, the 15-day notice requirement began to run.

HCA countered that, given that Ms. Hoffman is claiming a "standalone" mental injury with no accompanying physical injury, the 15 days began to run on April 9—yet it did not receive notice until May 2024. A gradual mental injury is not compensable under Tennessee law, it stated. HCA argued that "knowledge is not notice," meaning an employer's notice *of incidents* is insufficient, and Ms. Hoffman's conduct did not reasonably convey that she suffered an injury as defined in the statute.

6

Turning first to Ms. Hoffman's contention that the Vigilanz reports constitute timely written notice, she agreed that she did not report the April 2023 incidents under "Employee Health." Rather, she reported, respectively, a "Security Event," "Patient Provision of Care," and "Close-call/Near Miss." However, she reported the chest injury just one month before using "Employee Health," as protocol required. Ms. Hoffman used those alternative classifications despite admitting that she experienced severe symptoms immediately after the stressful events and never doubted that work caused her symptoms.

HCA convincingly argued that *Masters v. Industrial Garments Manufacturing Co.*, 595 S.W.2d 811 (Tenn. 1980), controls. In *Masters,* the Tennessee Supreme Court held that where an employee had previously been injured on the job and made a proper report at that time, but did not follow procedure in a later claim, it "cannot be doubted that she was aware of the proper procedure to follow in the event she wished to make a claim or give notice of an alleged on the job injury." *Id.* at 815. The same holds true for Ms. Hoffman.

As for Ms. Hoffman's assertions that HCA had actual notice, in *Masters,* the Court further held that "an employee who relies upon alleged actual knowledge of the employer must prove that the employer had actual knowledge of the *time, place, nature and cause of the injury.*" *Id.* at 816 (citations omitted)(emphasis added). In addition, "In order for a communication to constitute either written notice or actual knowledge on the part of the employer it must be calculated to reasonably convey the idea to the employer that the employee claims to have suffered an injury arising out of and in the course of her employment." *Id.*

Applying these principles, Ms. Hoffman testified that she told Mr. Stephens and the nursing supervisor on April 9 or 10 about the first incident, but she gave no details of those conversations. After the patient returned unsupervised the very next shift, she told Mr. Stephens about "the situation with this patient" and that she felt unsafe at work, and he responded that he would ask about building a barrier. He confirmed this in a text on April 12. Then, after the April 23 incident, Ms. Hoffman said she discussed that event with Mr. Stephens and Mr. Bruck, but she did not give details about these conversations, either.

In sum, in the days after each stressful event, apparently Ms. Hoffman talked to her supervisors about what transpired and her safety concerns. But the lack of detail she offered is troubling. On this record, the Court cannot find that they discussed the "time, place, nature and cause" of a work injury.

Ms. Hoffman also testified to several conversations afterward with Mr. Stephens, in which he recommended the employee assistance program, she responded that she was seeing a counselor, and he said he missed "the old Lindsey." They also discussed other complaints, such as a problem with bed bugs.

7

In contrast, Mr. Stephens testified that from April through August 2023, he and others spoke with Ms. Hoffman "to address her concerns with procedural and safety measures[,]" and "[b]ased on her continued dissatisfaction with proposed solutions and employee relations in her department, [he] suggested Ms. Hoffman speak with someone in [the] Employee Assistance Program[.]" But he also testified that Ms. Hoffman never advised him that "she suffered a work-related mental injury" or that "she was in need of medical treatment for a work-related mental injury."

What the Court divines from both versions of these conversations is that Ms. Hoffman and Mr. Stephens discussed her safety concerns and mental health—but, significantly, it is unclear whether they discussed a mental injury relating to work.

Ms. Hoffman testified that she began suffering severe symptoms immediately after the April 9 incident. After much back-and-forth on cross-examination, she testified that she never doubted that she suffered a work injury—yet she never clearly conveyed that to HCA until filing her petition.

Ms. Hoffman also contended she had no diagnosis in April 2023, stating: "[T]he extent of my condition and diagnosis was not known, nor could it be made at that time." Following this line of reasoning, her counsel alternatively argued that the day she took leave, September 6, 2023, is when the clock began to run on the notice requirement.

The Court disagrees. In *Nickerson v. Knox County,* No. E2020-01286-SC-R3-WC, 2021 Tenn. LEXIS 124 (Tenn. Workers' Comp. Panel June 8, 2021), a Supreme Court Panel adopted the Appeals Board's opinion, where an employee similarly argued onset of PTSD from a series of work events and contended the "last day worked rule" applied. The Board wrote, "[W]hile separate, identifiable work-related events resulting in a sudden or unusual stimulus can form the basis of a mental injury claim, a 'gradual' or cumulative mental injury claim has not been recognized as viable under Tennessee's Workers' Compensation Law." 2020 TN Wrk. Comp. App. Bd. LEXIS 52, at *16 (Sept. 2, 2020). Even if the Court were to accept this line of reasoning, Ms. Hoffman offered no proof that she gave sufficient notice within 15 days of September 6.

Rather, as HCA urged, the Court finds that the statute required Ms. Hoffman to give written notice within 15 days of the occurrence of the incident on April 9, which she did not do, unless HCA had actual notice, which it did not have. The statute goes on to say that benefits might still be payable when the requisite notice was not given when "reasonable excuse for failure to give the notice is made to the satisfaction of the tribunal[.]" Here, Ms. Hoffman gave no reasonable excuse for this failure. She admitted the immediate onset of symptoms but never told HCA she suffered a work-related mental injury or needed medical treatment for a work-related mental injury.

Therefore, the Court holds Ms. Hoffman is unlikely to show at a hearing on the merits that: she gave timely written notice; HCA had actual notice; or she had a reasonable excuse for her failure to give timely notice. Her request for benefits is denied at this time.

Finally, HCA contended it first learned of Ms. Hoffman's claim in May 2024 and denied it more than two months later. The Court refers HCA to the Compliance Program for investigation and the potential imposition of penalties regarding its failure to make a timely decision on compensability. Tenn. Comp. R. & Regs. 0800-02-14.04(6) (2022).

The Court sets a status hearing on **September 15 at 10:00 a.m. Central Time.** You must dial 615-532-9552 or 866-943-0025 to participate.

IT IS ORDERED.

**ENTERED May 21, 2025.**

_Kenneth M. Switzer_
**JUDGE KENNETH M. SWITZER**
**Court of Workers' Compensation Claims**

Premarked Exhibits:

1. Declaration of Lindsey Hoffman
2. Declaration of Alex Stephens
3. Declaration of Kristen Dobson
4. Declaration of Stephanie Edgison
5. Declaration of Dr. Jamieson
6. Medical records, Dr. Jamieson
7. Stipulations
8. Declaration of Beverly Adkins[1]
9. Deposition of Beverly Adkins
10. Text messages
11. Medical leave requests

---

[1] Ms. Hoffman moved to exclude the declaration from evidence, arguing that Ms. Adkins signed it under coercion, or alternatively asking that the Court also admit Ms. Adkins's deposition. HCA opposed the admission of the discovery deposition as hearsay, contending that Ms. Adkins was not unavailable. After hearing the parties' positions, the Court admitted both documents and explained that it would give them whatever weight is appropriate to the determinative issue. On further reflection, neither document bears on the outcome of this hearing.

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on May 21, 2025.

| Name | Certified Mail | Regular mail | Email | Sent to |
|------|---------|---------|-------|---------|
| Ashley McGee, employee's attorney | | | X | ashleymcgee@rockylawfirm.com<br>paige@rockylawfirm.com<br>carleypodlasek@rockylawfirm.com<br>smartadvocate@rockylawfirm.com |
| Taylor Pruitt, Catheryne Grant, employer's attorneys | | | X | CLG@feeneymurray.com<br>TRP@feeneymurray.com<br>shelby@feeneymuray.com |
| Compliance Program | | | X | WCCompliance.Program@tn.gov |

_____

Penny Shrum
Clerk, Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board.  To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.
    ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.
    ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.
    When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal.  Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service.  In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee.  You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal.  **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal.  If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee.  If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk.  The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted.  For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

    **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable.  See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury:** _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____ ☐ Motion Order filed on _____

☐ Compensation Order filed on_____ ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

### Parties
**Appellant(s)** (Requesting Party): _____ ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee
Appellee's Address: _____ Phone: _____
Email: _____
Attorney's Name: _____ BPR#: _____
Attorney's Email: _____ Phone: _____
Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*